Good morning, ladies and gentlemen. Our first case for argument this morning is NHC v. Centaur Construction Company. Ms. Herring. May it please the court. Good morning, your honors. My name is Kim Herring and I represent the defendant appellants Centaur Construction, Peter Alexopoulos, and Spiro Tsipras here today. This case arises out of the design and the construction of the Nobu Hotel Chicago in the West Loop neighborhood. By way of background on how we got to this court, there were a number of issues submitted to the district court on summary judgment which resulted in a finding of liability on breach of contract against defendant Tsipras and Centaur Construction Company. The case proceeded to trial on damages for breach of contract and liability and damages for the fraud claims. A jury verdict was entered against Centaur Construction Company, Peter Alexopoulos, and Spiro Tsipras. Various post trial briefs were filed and adjudicated resulting in an amended judgment being issued in March of 2023. And that brings us here today. There are several issues presented in this appeal and through various avenues presented in our brief the appellants have requested for both portions of the judgment to be vacated and also for a new trial. The first issue that I would like to address is the apportionment of damages that has been carried out in the verdict form. A pillar of Illinois corporate law is that the executives, the officers, directors of a firm are liable for breaches of contract absent extenuating circumstances such as breaching or such as piercing the corporate bail. In this case there was a finding that the bail had been pierced against Mr. Tsipras but not one against Peter Alexopoulos. The way that the verdict form that was eventually signed by the jury was drafted was to apportion all damages for both breach of contract and fraud together. So the way the verdict form is written it is impossible to apportion which damages are for fraud and which damages are for breach of contract. The result of this is that Mr. Alexopoulos pursuant to the judgment that has been entered is liable for this judgment award. However because the judgment award is for breach of contract and fraud and because he cannot be... Did you ask for a details would have changed? We had the verdict form separated out to apportion which damages were for breach of contract and which damages were for fraud. Now if I recall the district judge said that would have been even more confusing so you might want to address that. So the way that it's written now there's no way to tell if Mr. Alexopoulos is liable for just breach of contract or... I'm asking you to address the district courts rationale that your proposal would have been even worse. I believe our proposal would have separated out the damages by particular defendant and by particular claim which would allow us now to apportion the damages in a way that's consistent with Illinois law. By separating out which defendant is liable for which breach, which defendant is liable for which element of the fraud damages claimed, it would allow us to apportion the verdict in a way that would not have Mr. Alexopoulos paying damages personally for a breach of contract action which he cannot be responsible for pursuant to Illinois law. As to the case law that cited judge, the case that cited by my opponents was the Duran case and that does not deal with breach of contract or fraud cases. It's a 1983 case and so it just doesn't address these issues on point. The second issue that I wanted to address was the missing witness instruction and that is an abuse of discretion standard. Judge Kennelly's order on the rule 50 motion that defendants filed at the end of the trial acknowledges that Mr. Nunez's testimony is of key importance to the fraud issues before the court. So by way of background, Mr. Nunez was the project accountant for NHC on this project and he knew, he was told by my clients, that the documentation showing how much money had been spent on the project and the status of construction was inaccurate. He was told by my clients, and he admitted this, and my clients testified to the same, that there was a cash flow projection created at the very outset of this project which was a estimate of how much money would be needed and when. And this is a document that had perfectly round numbers and it's even pasted directly into our opening brief. Throughout the scope of this project, over more than a year, the payments that were requested by my clients to NHC were the payments that mirrored that cash flow projection as requested and so NHC would reach out to my clients and say, hey can you send me an invoice for 2.3 million dollars pursuant to this cash flow projection? And my clients would say yes of course. So of critical importance to this case was Mr. Nunez's testimony. Mr. Nunez is the only NHC witness who was told these things and who admitted that he was told that these documents were not representation of work performed, but actually just in line with that prior document. Was that different distinctly, I guess, from the deposition testimony? So he admitted these things in his deposition testimony, correct, but the scope of the case had changed. The principal witnesses for NHC were deposed after Mr. Nunez and so they had some conflicting testimony we were not able to ask him about. Some of the accusations and the issues surrounding the fraud claims changed throughout the scope of, you know, a three-year litigation and he was one of the first witnesses that we had deposed. What more would have been brought out if he had been called to testify? Well we would have been able to ask him about other, about some of the statements that the leading witness, the 30b6 plaintiff's representative, was able to testify to. He testified to things like he didn't know that the project documents were, you know, not representations of what had been performed and that type of thing. We would have been able to call on Mr. Nunez to counter those specific examples that he testified to at trial. So as far as Mr. Nunez, he was physically available only to NHC pursuant to the Mahone test which is cited in our briefs and he had a relationship with NHC that would in a pragmatic sense make his testimony unavailable to us. It was represented to us all throughout the litigation that Mr. Nunez was represented by NHC. He was living in Mexico. We took his deposition via videoconference while he was down in Mexico and then a month before trial they informed us that he was vanished from their control. So we had no subpoena power in a month's time to get to him in Mexico and had no ability to otherwise call on him to testify. The next issue I want to address is the issue of the motion in limine on the settlement correspondence and that is a de novo review. There was an email sent by my client Spiro Tsipras to NHC's Rodrigo Chapur about a month or two before litigation was actually filed in this case and my client sent that email a week after NHC, my client, and Deloitte met to do a financial auditing of this construction project and my client proffered an affidavit which included the notion that he had been told by NHC's Rodrigo Chapur that everything relating to the project was out of NHC's hands and in the hands of their lawyers. So my client's uncontradicted testimony in an affidavit is that he had, he knew that litigation was eminent and he sent this email in order to try and settle the case. So it is settlement correspondence under Rule 408 and the judge erred in admitting it and allowing it to be shown to the jury at trial. I would like to reserve the remainder of my argument for rebuttal. Sergeant McHousel, Mr. Grower. Good morning your honors and may it please the court. My name is Josh Orweiler and I represent the plaintiff appellee NHC LLC. This case is on appeal following a jury verdict in the plaintiff's favor that found each of the three defendants liable for fraud and awarded the others in compensatory damages. And while the appellants, the defendants, have raised a voluminous number of issues on this appeal and I'm happy to answer any questions that your honors have on any of those issues, I plan to spend the majority of my time addressing issues that relate to the fraud claim as that is the primary claim in this case. Defendants argue that the fraud claim... Yes, your honor. So the verdict form used by the district court was one that had a specific portion of it for the jury to find either in favor of the plaintiff or in favor of each individual defendant on the fraud claim. And the jury found that each of the three defendants committed fraud. The verdict form used by the district court then laid out the damages that NHC was seeking and asked the jury to award damages, if any, pursuant to the three categories of damages that NHC was seeking. And the district court properly applied this court's precedent in Duran v. Town of Cicero, which held that damages should be awarded for an injury and not by claim or by defendant. And the request by defendants to apportion damages between the defendants would be that fraud is an intentional tort and it gives rise to joint and several liability. And so each of the defendants, having been found liable for fraud, are liable to NHC for the entirety of the damages awarded by the jury. There's also no case law in Illinois, and certainly nothing cited by defendants, that requires damages to be apportioned by claim or by defendant. It would be quite confusing to the jury to ask them to apportion damages between claims or defendants here because it would cause them to think they should split up the damages. And that's simply not the law. The fraud claim gives rise to joint and several liability, and even the contract claim, because the district court pierced the corporate veil against Mr. Alexopoulos, that gives rise to joint and several liability as well. So the district court acted properly in using a verdict form that did not cause confusion to the jury. And the only issue that comes up, Illinois law allows parties to seek as many different claims, even if the damages are the same as they can bring. The only limitation on that is that a plaintiff can't get a double recovery. And the way the district court set this up, there was no double recovery, and there is no issue of a double recovery by plaintiff. Plaintiff has not sought to recover its damages twice, nor did it. Defendants also argue in their brief that the fraud claim impermissibly duplicates the breach of contract claim. That is simply not the case. The fraud claim is based on a voluminous number of affirmative false statements of fact that occurred after the contract was entered into. This is not a case where the plaintiff is seeking to rely on a contractual promise to bring a fraud claim. The district court gave two examples of why the fraud claim was distinct from the breach of contract claim, and defendants have never been able to address those examples. They didn't address them in the district court, and they didn't address them in their briefs in this court. In addition, in their rule, their renewed motions for judgment as a matter of law, defendants make a number of arguments about the sufficiency of NHC's evidence in support of its fraud claim. I would submit that each of those arguments fail. There was a voluminous amount of evidence presented at trial, particularly with respect to reasonable reliance. There was specific witness testimony from a manager of NHC that he reviewed and relied upon, the payment applications and contractors affidavits submitted by the defendants, and with respect to reasonableness, these payment applications and contractors affidavits, they are written, signed, sworn, and notarized, and it is absolutely reasonable for a party to rely on a sworn affidavit. NHC also presented sufficient evidence of fraudulent intent. This can be proven by circumstantial evidence. The defendants admitted that they knew the statements they were making in these sworn applications and contractors affidavits were false, and this was a repeated pattern that occurred over a significant period of time, where the defendants would repeatedly make false statements to obtain multimillion-dollar progress payments from NHC, and as soon as they got those funds, which NHC's expert testified were paid on average within five days of the payment request, as soon as they got the funds, they spent significant portions of them on things that had nothing to do with this project. It was more than reasonable for the jury to infer that at the time they made their false statements, they did so with the intent to obtain money to fund things other than this project. With respect to the district court's decision to decline a missing witness jury instruction, the district court did not abuse its discretion on this issue. Missing witness jury instructions are disfavored. They should be used only in unusual circumstances. There was not a jury instruction actually submitted to the district court, and I would submit that the defendants failed to preserve that issue for appeal, but in any event, Mr. Nunez was employed by a third-party Mexican company that was providing services to NHC. He was never an employee, certainly never an officer, director, or manager of NHC, and at the time of trial, he didn't work for that Mexican company anymore, and NHC simply did not have the ability to force him to get on an international flight and fly to Chicago for an in-person jury trial. He was deposed in discovery. He was asked an extensive amount of questions by defendants. He did not refuse to answer any questions asked of him, and defendants read the significant portions of his deposition testimony into evidence, and given these facts, there's simply no prejudice to the defendants, and there was simply never any representation that NHC was ever going to bring him to trial in this case. Briefly, the defendants also argue that the district court abused his discretion in admitting an email from Mr. Tapares. Defendants claim that was a settlement communication. The district court properly rejected that argument. There is literally nothing in that email that references settlement or compromise or attorneys or a potential lawsuit whatsoever. The email simply contains statements and admissions that were properly admissible at trial, and in any event, this was one of 87 different exhibits admitted into evidence at trial. The court should hold that the district court did not abuse its discretion on that issue. With respect to defendants' argument that the district court abused its discretion in declining to amend the $150,000 in attorneys' fees to NHC, there was witness testimony presented at trial that NHC incurred those attorneys' fees. They were incurred because of the defendants' misrepresentations about subcontractors having been paid on the project, when in reality they hadn't, and NHC incurred those fees in settling mechanics liens and in defending a mechanics lien lawsuit filed by one of the subcontractors. Finally, defendants also argued that the district court abused its discretion by awarding NHC prejudgment interest. Prejudgment interest was appropriate in this case for two reasons. First, the contract between Centaur and NHC is an instrument of writing under the Illinois Interest Act, and the damages were subject to easy computation. The jury awarded NHC approximately 95% of the compensatory damages sought, and there's no Illinois law that requires a jury to award the exact amount of damages down to the penny in order for a plaintiff to recover prejudgment interest. And, well, unless the court has any further questions, we would respectfully rely on our brief for any remaining arguments raised by the defendants, and I would ask that the court affirm the district court's ruling in their entire and I would thank your honors for your time this morning. Thank you, counsel. Anything further, Ms. Herring? As to the issue of the verdict form, counsel addressed the Duran case, and I touched on that a bit in my opening argument. That's a 1983 case dealing with police brutality, but the most important part that distinguishes Duran from what's in Duran is that the same damages for an injury, not a claim, in Duran did not result in a violation of Illinois law. That's what we would have here. There was no veil-piercing claim against Peter Alexopoulos. There was never any breach of contract claim against Peter Alexopoulos. So apportioning this verdict amount, which is for both fraud and breach of contract, in a way that cannot be separated out, would violate Illinois corporate law. And that is the big, most important key difference between this case and the Duran case. As far as the jury instruction on the missing witness, counsel pointed out that the defendants did not attempt to issue a missing witness instruction. We filed a motion to compel NHC to produce this witness to testify at trial or in the alternative for a missing witness instruction. Judge Kennelly denied our request for a missing witness instruction. So it was not appropriate for us to tender a missing witness instruction to a judge who had already told us that it was not going to be allowed. The next issue with regards to the international flight that Mr. Nunez would have needed to take, NHC called witnesses via teleconference. A teleconference deposition, you know, is something that we are able to do this day and age. Finally, counsel said that there was no requirement or there was no expectation that they would produce Mr. Nunez to testify at trial. Mr. Nunez was the project accountant for RCD and we kind of lay out in our brief the connection between RCD and NHC. They were one in the same as stated by NHC's attorneys. The other witnesses that did come to Chicago to testify at trial that were members of RCD were Mr. Israel Navarro and Mr. Roberto Chapur. So NHC had represented to us from the beginning of the lawsuit that they represented Israel Navarro, the witness in question, I'm sorry, Israel Navarro, Roberto Chapur, and Manuel Nunez, the witness in question. And Manuel Nunez is the only one that they did not bring to Chicago to testify and Mr. Nunez was also the only one who testified that he knew all of our project documentation were not accurate reflections of work performed. Opposing counsel also mentioned that the settlement correspondence that I addressed had no buzz. Did they have control over Nunez? Mr. Nunez was their former employee, yes. And so I guess we've heard an oral argument this morning is that he was never an employee. So as we set out in our brief, NHC represented from the very beginning that NHC and RCD were one in the same. So they represented to us that RCD was a brand name and it had a number of companies that fell under the umbrella of this name of RCD. And RCD has hotels all around the country, but they set up different companies for different hotels and different purposes and then they operate as RCD. So the project accountant at issue was the project accountant for brand RCD and he worked on a number of different RCD projects including the Nobu Hotel Chicago. So in all of the depositions of my clients of NHC's individuals, their attorneys said, you know, on the record, you know, I'm going to talk about NHC and RCD. I'm going to use those terms interchangeably here today because they were interchangeable. Mr. Nunez was the project accountant for NHC. He worked for a different named company, but it was all under the umbrella of RCD and they all represented themselves as part of ownership of the Nobu Hotel Chicago. The settlement conference language that Mr. Orweiler pointed out, he noted that there weren't any buzzwords for settlement in the email correspondence. This was an email sent from the president CEO of Centaur Construction. He's not an attorney. There was no attorney for Centaur up until that point. Even through contract negotiations, Centaur did not have an attorney and NHC did. So his knowledge of settlement buzzwords was, you know, not included in there, but it was still based on his uncontradicted testimony. An email that he sent in an attempt to settle the case because Mr. Chippoor had told him that the lawyers were involved. What language are we drawing from that that suggests settlement discussions? He sent an email to Rodrigo Chippoor saying, here's how much it's going to cost to complete the project. Here's how much Centaur will pay of that. Here's how much you will pay of that. Here's how much money has been spent on the project. Those types of things. So it was like a financial accounting type of a situation where he was trying to say, okay, we're responsible for this. We'll pay for this much. You guys pay for this much. It was kind of a let's sort this out. Let's work together to move forward from a financial perspective. And his affidavit we submitted to the court says unequivocally that he knew that there were lawyers coming in. So he sent this email in order to sort out the issue in order to prevent it going to litigation. I see that I am almost out of time unless your honors have any further questions. I thank you for your brief that the award be amended and or vacated. Thank you. The case is taken under advisement.